R. Toombs, for plaintiff in error.

Hester & Lumpkin, for defendant.

426 *ROBERT CUNNINGHAM et al., plaintiffs in error, v. JOHN SCHLEY et al., executors, defendants in error.

(Atlanta, June Term, 1870.)

MARRIAGE SETTLEMENT—RECORDATION—BONA FIDE CREDITORS—DEBT DUE BY HUSBAND.*—The Act of 1847, requiring marriage settlements previously made to be recorded in the county of the husband's residence within twelve months after the passage of the Act, or be void against bona fide purchasers or creditors without notice, who purchase or give credit, before the actual record, applies only in favor of bona fide creditors, who, without notice, give credit on the faith of the property. and does not render the settlement void in favor of a debt due by the husband, as guardian, under the appointment of the Ordinary, or under a testamentary appointment without affirmative proof that, on the testamentary appointment, credit was given to the husband on the faith of the property.

EVIDENCE—DECLARATIONS AGAINST INTEREST—DECLARATIONS OF DECEASED TRUSTEE.—Declarations and entries by a person, since deceased, against his interest, and not made

See the same case in 68 Ga. 105.

*MARRIAGE SETTLEMENT—RECORDATION—BONA FIDE CREDITORS—DEBT DUE BY HUSBAND.—"Section (1778) of the Code, (which substantially embodies the provisions of the act of 1847, as interpreted by this court) declares that 'Every marriage contract and every voluntary settlement made by the husband on the wife, whether in execution of marriage articles, or not, must be recorded in the office of the clerk of the superior court of the county of the residence of the husband, within three months after the execution thereof. On failure to comply with this provision, such contract or settlement, shall not be of any force or effect against the purchaser, or creditor, or surety, who bona fide, and without notice, may become such before the actual recording of the same.' Who is a bona fide creditor within the true intent and meaning of the statute? A bona fide creditor is one who gives credit to the husband on the faith of the property contained in the marriage settlement. Cloud and Shackelford v. Dupree, 28 Ga. 173; Cunningham v. Schley, 41 Ga. 435. The creditor of the husband must become such on the faith

with a view to pending litigation, are competent evidence, and this
applies to a case where two sets of beneficiaries are in dispute as to
whether their common trustee has invested certain trust funds in
lands, taking a deed in his own name, and it is sought to prove by the
admissions of the deceased trustee, that the land was bought with the
funds of one of the sets of beneficiaries.

TRUSTS AND TRUSTEE—TRUSTEE FOR LIFE HOLDS
FOR REMAINDERMEN†—TRUST FUNDS INVESTED IN
TRUSTEE'S NAME.—Where there is a marraige settlement to the
wife for life, and at her death to her children, the trustee, who holds
the title during the wife's life, holds it as trustee for the remainder-
men, and if he invest the trust funds in his own name, they may fol-
low them as in other cases of trust.

NEW TRIAL—SUBMISSION OF MATTERS OF LAW AND
FACT TO JUDGE—PRESUMPTION IN FAVOR OF VERDICT.
—If the parties in a suit pending agree to submit both matters of
law and fact to the Judge, and, after a hearing, he makes a judgment,
this Court will, in a motion for new trial, make the same presump-
tion in favor of the verdict as though the case had been tried by a
jury, and if there be evidence to authorize the verdict, a new trial
will not be granted, even though this Court be not satisfied that the
weight of testimony is with the finding.

SAME—NEWLY-DISCOVERED EVIDENCE — DILIGENCE.‡
—When the principal matter in dispute on the trial was whether cer-
tain real estate, the title to which was taken in a trustee's own name,

---

of the property contained in the settlement before the actual record-
ing of the same." Brown v. Spivey, 53 Ga. 159.

In order for a creditor to avoid a voluntary settlement by a hus-
band on a wife which was not recorded within three months, on ac-
count of credit given before actual record, he must be a bona fide
creditor who gave credit on the faith of that property; that is, upon
the belief that the husband owned that property. Gentry v. Cowan,
66 Ga. 720, citing the principal case.

See the principal case cited to the same effect in Sims v. Albea, 72
Ga. 759.

†TRUSTS AND TRUSTEES—TRUSTEE FOR LIFE HOLDS
FOR REMAINDERMEN AND BENEFICIARIES.—A testator be-
queathed certain realty and personalty to a trustee to be held for his
daughter's benefit and "at her death to go to her children and if she
should die without children" then the property was to go to testator's
heirs at law. The first trustee resigned and a second was appointed
and gave bond to the ordinary. This bond recited his appointment,.
stated the property received by him, and was conditioned for the
faithful performance of "all and singular the duties required as trus-
tee, agreeably to his appointment and the law and also well and faith-
fully to account of and concerning the said trust." It was held that
this bond was not solely for the protection of the cestui que vie and
her heirs, but was for the protection of the heirs of the testator as
well upon the death of the daughter without children. That the du-
ties of the trustee were not fully performed until he turned the prop-
erty over to the beneficiaries in accordance with the terms of the
trust; until then his accountability for the property and its increase
continued. Haddock v. Perham, 70 Ga. 572, citing Cunningham v.
Schley, 41 Ga. 426; Findlay v. Artope, 48 Ga. 537.

‡NEW TRIAL—NEWLY-DISCOVERED EVIDENCE—DILI-
GENCE.—Newly-discovered evidence that most probably might have
been discovered earlier with reasonable diligence, is not ground for
a new trial—certainly not if first brought forward after final judg-
ment disposing of the whole case on writ of error. Slater v. Manes,
54 Ga. 671, citing the principal case.

To authorize the grant of a new trial on the ground of newly-dis-
covered testimony, the movant must show diligence; and when it ap-
pears that the levy was made in 1873, and the trial not had until 1878,

had been purchased with trust funds, and the vendor was accessible
to both parties, and after the trial the losing party prays for a new
trial, on the ground that he has discovered, on inquiry of the vendor,
new and material evidence upon the point in dispute which he did
not know at the trial, and no excuse is given why application was
not made to the vendor before the trial:

*Held*, that this is not such diligence in preparing for trial as will
authorize the Court to grant a new trial, that the newly-discovered
evidence may be heard and considered.

SAME—TWO CASES TRIED TOGETHER—NEW TRIAL IN
ONE CASE.—When two cases were tried together, by consent, and
under an order of the Court, and after verdict, a new trial is moved
for in the general decree:

*Held*, that the Court may grant a new trial in one of the
cases and refuse it in the other, the verdict not being so de-
pendent as to make such a cause unjust to either party.

DIMINUTION OF RECORD—WHEN SUGGESTED.—A dimi-
nution of the record must be suggested on or before calling the case.
(R.  See end of Report.)

BILL OF EXCEPTIONS—CERTIFICATE THAT BILL IS
ORIGINAL—WRIT OF ERROR WILL NOT BE DISMISSED.—
If the bill of exceptions be attached to the record, a certificate on the
record that "the accompanying bill of exceptions is the true original,"
etc., is sufficient to keep the writ of error from being dismissed. (R.
See end of Report.)

CERTIFICATION OF RECORD OUT OF COUNTY OF
CLERK.—A Clerk of the Supreme Court may not certify a record
out of his county. (R.  See end of Report.)

RECORD IN DETACHED PARCELS—AFFIDAVIT MAKING
CERTIFICATE COVER ALL PARTS.—If the record be in de-
tached parcels the Clerk below may, in the Supreme Court, attach
them together and by affidavit make the certificate cover all the
parts. (R.  See end of Report.)

Marriage Settlements. Trusts. Arbitration, etc. New Trial.
Bill of Exceptions. Practice. Before Judge Andrews. Rich-
mond Superior Court. June Term, 1869.

In 1851 Charles Cunningham died, testate, leaving a large
estate and many legatees. By the will he appointed a guard-
ian for the person of his children and George Schley as the
guardian of their property, with power in him to change the
character of investments as he thought best. Cunningham's
executors turned over to George Schley, as such guardian, a
large amount in bank stocks. In 1855, 1856 and 1857, one
White died, intestate, and Cunningham's children received a
large fund from his estate which was turned over to George
Schley upon his becoming their statutory guardian, in March,
1855.

George Schley died in 1866, and Cunningham's children

---

and that the evidence newly discovered concerned only the posses-
sion of the land in the tenant of defendant after judgment—a thing in its
nature notorious—and that this was discovered from three witnesses
who lived in the county and were always accessible, and that no rea-
son or excuse is given for the want of preparation of the case, and
then not having these witnesses to testify on the trial, it was held
that the diligence which the law requires has not been exercised and
a new trial on account of the discovery of such evidence from wit-
nesses so accessible, should not have been granted. Knowles *v.* Jour-
dan, 61 Ga. 300; Cunningham *v.* Schley, 41 Ga. 426; Wallace *v.* Tum-
lin, 42 Ga. 462.

filed a bill against his executors for an account and settlement of said trusts, charging waste, imprudent changes from bank stocks into promissory notes, over-charges of commissions, etc.

George Schley's children filed another bill against their father's executors. They made this case: In 1832 he made an antenuptial agreement with their mother, whereby he secured the corpus of all property "coming through her" to herself for life and to their children in remainder, and then married their mother. This marriage was solemnized in Jefferson *county and the settlement was there recorded. The trustee therein appointed surrendered the trust to George Schley. This trust property was to be free from the debts, contracts or control of George Schley.

In his will, he mentioned the sources from which he had received Mrs. Schley's money and stated that he owed his children $16,047 00. Said will also recited that he had received from the estate of a deceased uncle of Mrs. Schley $36,441 80 for her. Besides these sums of money, he received many slaves and their profits for many years. He also received $10,000 00 for his wife from the estate of a deceased aunt. Soon after the marriage he bought a plantation with these trust funds, sold it and invested the proceeds in "El Dorado," near Augusta. What was called El Dorado was in two parcels, one parcel was bought from Fleming in 1856, the other from Easterling in 1861. "Mill View," the "Quarry Tract," and various other described lands were bought with the said trust funds of their mother. She died in 1865. They claimed that George Schley's estate was first chargeable with their said trust demands and prayed that they should be paid to the exclusion of all others,' and that the specific property specified be decreed to be theirs because bought with their trust funds. The executors of George Schley ceasing to be parties, his administrator de bonis non became the party instead.

By consent these causes were consolidated and submitted to Judge Andrews to decide without a jury. The evidence of the trial is concisely this: The deaths, marriages, etc., of the parties, or their kindred, so far as were material, were admitted or proven. The will of Cunningham and the returns of George Schley, as such statutory and testamentary guardian, and George Schley's will, were put in evidence. It was shewn that the marriage settlement was made in 1833, and was never recorded elsewhere than in Jefferson county, and not there till 1849, when George Schley was living in Richmond county. The titles to El Dorado and all the lands were taken by George Schley in his individual name. When he became *such statutory guardian he was of large means. He died in 1866.

Pending the trial various questions were raised and decided as follows: The recitals in George Schley's will of his in-

debtedness to his children were relied on to show the quantum and character of the indebtedness. They were objected to as not binding upon the Cunningham children. The objection was overruled.

The Judge decided that, under the evidence, George Schley had not acted illegally or imprudently in his change of the investments of the Cunningham children's stocks for notes, though the stocks brought a large interest annually; that he was entitled to two-and-a-half per cent. commissions on money received and paid out in changing these investments; that he had no right to use the corpus of the property held by him as statutory guardian; and that the estates of the uncle and aunt were held by him as statutory guardian, in as much as he received them by virtue of administration, and not by virtue of and under said will. Upon the authority of Cloud & Shackleford v. Dupree, 28th Georgia Reports, 173, he held, that if the Cunningham children were creditors of George Schley, they did not give credit upon the faith of the property settled upon his wife, and that, therefore, the failure to record the marriage settlement did not avail them. It did not appear that Charles Cunningham was a creditor of George Schley, or if it did, that he had notice of this settlement.

It appeared that the records of Jefferson county were burnt by Sherman's army, and thereupon the contents of the marriage settlement were shown by witnesses, and by the recitals in George Schley's will. Under the Act of 1856, he presumed that it was correctly executed.

The codicil to the will of Robert Schley, the uncle, was in the words: "I bequeath to Charles Cunningham and Margaret Schley (George Schley's wife) for their use, during their life time, the bulk of my property." * * * * "I leave them or the children or child living to share and share alike, and in case there should be but one alive, then that he or she takes all after the death of the said Charles Cunningham *and Margaret Schley." Under this he held that George Schley took nothing as trustee for his children, the remaindermen: 27th Ga. R., 96; 26th, 145, 678; Fearne on R., 57-58; 14 Ga. R., 404-9; 7th, 546.

George Schley's will contained the following words relating to said marriage settlement: "All the property *coming through her* (his wife) was secured to her and the children she might have," etc.

The Schley children contended that the italicised words covered all the property which came to their father, for their mother, from her mother's estate. The only witness to the contents of the marriage settlement said his impression was that its main feature was to secure the corpus of the property to his wife and children and the increase to George Schley. And in stating in his will what he owed his children, George Schley included nothing but what he received

from Robert Cunningham's estate and under the marriage settlement. And as he got from Robert Cunningham a life-estate only, which had ended before the will was made, the Judge held that nothing passed under the marriage settlement except what Mrs. Cunningham had at the date of the marriage.

He held that the par balance appearing against George Schley as guardian, by his return in 1865, was not properly disposed of by the Confederate currency investments, with which it was sought to be disposed of, inasmuch as it did not appear that the wards had any Confederate currency or how their assets had been converted into such currency. And he held that no commissions could be charged on property turned over prior to the Code. Where it appeared that the dividends on stocks were paid to him in Confederate currency, when prudent men took it, he was allowed credit for it.

It appeared that all of the land of George Schley, except El Dorado, were bought with his own money. And the price paid for El Dorado, added to the indebtedness to his children admitted in his will, was sufficient to cover all the trust funds which he received for his children. It was held that none of the lands except El Dorado were the property of the children. It was shown by relatives of George Schley that he had frequently said he bought El Dorado with the trust funds, and these sayings were long ante litem motam and while he was in prosperous circumstances. Besides, it appeared he had no individual property till after El Dorado was bought. It therefore was held to belong to his children. He also decided that the Schley children had shown that George Schley, as trustee, owed them $13,755 00, but he allowed maintenance and education to set off the interest up to George Schley's death. There being no other parties before the court but these Schley and Cunningham children, the rights of general creditors were not passed upon in these decisions.

Accordingly he decreed that, after payment of funeral expenses and other things previously to be paid by the statute of distributions, the administrator de bonis non of George Schley should pay the Schley children $13,755 00, with interest from George Schley's death; to Anna Cunningham $41,333 66 (and $2,147 74 in United States currency, as accrued interest;) to Eliza Cunningham $44,263 99; to Robert Cunningham $53,376 62, and to Mary Cunningham $48,594 94; all of which payments to the Cunningham children, except the said accrued interest, were to be in gold, with interest since the 1st of September, 1869. These several amounts were fixed by an auditor who had acted pending the litigation and brought his report in on the 1st of September, 1869.

The Cunningham children moved for a new trial upon the following grounds of assigned errors:

1st. Because the Chancellor erred in deciding that complainants, R. E. Cunningham et al., as wards of George Schley, were not bona fide creditors under the act of 1847, of the estate of George Schley, and that, therefore, as to them it was not necessary that the marriage settlement between George Schley and his wife should be recorded in the county of his residence—more especially as to the amounts due them by George Schley as statutory guardian.

2d. In holding that the recitals contained in George Schley's will and his sayings, as testified to by witnesses who *heard them, were competent to prove the contents of his marriage settlement, and to set up a trust in favor of his children as against the claim of his wards.

3d. In holding that the terms of the marriage settlement, even as set forth in Schley's will and as testified to by the witnesses, created a trust in favor of his children.

4th. In holding that the proof of the contents of the marriage settlement was sufficiently definite to enable the court to ascertain its limitations and provisions.

5th. In holding that the children of George Schley had traced their trust fund into El Dorado.

6th. In holding that said children of George Schley were not only entitled to the El Dorado place, which cost George Schley $18,000, but also to the whole amount stated to be due them in George Schley's will, viz: $13,755 00.

7th. In holding that George Schley's children were entitled to the whole of El Dorado, when the terms of the settlement as set forth in George Schley's will, show that George Schley himself was entitled to one-seventh of all the trust property under his marriage contract after the death of Mrs. Schley.

8th. In holding that George Schley's children were entitled to the whole of El Dorado, when there was no evidence whatever going to show that the part bought from Easterling was paid for with trust funds—that part being bought nearly six years after the purchase of the portion sold by James Fleming.

9. Because of newly discovered evidence which has come to complainant's knowledge since the trial, proving that George Schley bought El Dorado with individual funds of his own and funds belonging to complainants, his wards.

10. Because the ruling that the children of George Schley had traced their trust funds into El Dorado was contrary to evidence and the weight of evidence.

11th. Because no interest is allowed to complainants on the sums due them respectively prior to the date of the report of the auditor.

The newly discovered evidence was that the persons who *sold El Dorado to George Schley were not paid for it in cash, but in installments from time to time,

and that these payments were made by checks and drafts, and that these drafts and checks were drawn by George Schley upon deposits standing in his own name, etc. The facts were fully set forth in affidavits of the sellers, the cashier of the bank, etc. And the usual affidavits were made by complainants, showing their ignorance of these facts at the trial and giving their reasons for not learning them before. The main reason was that they supposed, till told by one of the sellers after the trial, that El Dorado was paid for in cash, as no mortgage for its purchase money was recorded.

The Chancellor overruled all the grounds for new trial except the 6th, 8th and 11th. A new trail was ordered on the 6th ground, unless complainants would remit the $13,755 00 decreed to them; on the 8th unless complainants would release to George Schley's administrator so much of El Dorado as was bought from Easterling; and on the 11th ground, unless the administrator pay, pro rata, to Robert Cunningham $52,477 58, and to Anna Cunningham $41,333 66 (plus $2,147 74 in United States currency), to Eliza Cunningham $44,263 99; to Mary B. Cunningham $48,408 13, with interest on each from the 1st of October, 1866, except Mary B. was to have interest from February 15th, 1865, and all was to be paid in gold except the sum in ( ).

The Schley children remitted all that they were required to remit; the administrator de bonis non refused to consent to any change of the decree. Thereupon the Cunninghams and said administrator, de bonis non, claimed that the refusal of the administrator, de bonis non, to such modifications of the decree rendered the decree inoperative, and they moved for an order for a hearing de novo upon that ground. This was refused.

Error is assigned upon the refusal to grant a new trial upon the grounds overruled, upon the conditional grant upon the other grounds and upon the refusal of the said order for a hearing de novo.

When the cause was called here, there was a motion to *dismiss the writ of error, because there was no proper certificate of the Clerk below that any paper is the original bill of exceptions, and because the paper certified as the transcript is not such, and the paper shown as the balance of the record is not identified. The bill of exceptions came up detached from the record and the record was in two parts. To one of these parts of the record, was a certificate that "the foregoing transcript is a true and complete copy of all the proceedings in the before stated case, and that the accompanying bill of exceptions is true original bill of exceptions," etc.

After arguing the motion for some time, counsel for plaintiff in error proposed to suggest a diminution of the record and thus get an entire record certified. The Court held that

Cunningham v. Schley

this suggestion could not be made after argument of motion to dismiss was begun.

Pending further argument the Court adjourned till next day. Ad interim, the Clerk of the Court below came with his seal of office. When the Court convened next day, counsel for plaintiff in error proposed to have the Clerk then and there to certify the record. It was objected that he could not act officially out of his county. That objection was sustained. Then the Court suggested that the Clerk be sworn to show that the certificate applied to said papers, and then be allowed to attach them together preceding said certificate. This was done and the cause was allowed to proceed.

Johnson & Montgomery, for plaintiffs in error. Who are creditors as against this marriage settlement and the consequences of not recording it: Cobb's Dig., 180; R. Code, sec. 1934; 16 Ga. R., 111, et seq.; 32d, 167; 28th, 170; 35th, 243; 14th, 595. The recitals in the will and the sayings of testator were not competent to show the contents of said settlement: 40 Ga. R., 479; 39th, 550; 2 Leigh, 29; 1 Gr. Ev., secs. 337, 341; 28 Ala. R., 623; Code, sec. 3798; 7 Exch. R., 354; Ryan & M., 198; 3 John Ch. R., 488. A settlement securing the corpus to the wife and children creates no trust: R. Code, secs. 2234, 2228, 2244; 26 Ga. R., 145, et seq.; 14th, 404-9; R. Code; 7th, 517, 530. As to *statutes of limitations as to remainders: 36 Ga. R., 199; 8th, 378-9, 518; 37th, 342. The settlement as proved was too uncertain: 1 Peters, 591; 7 Curtis, 719; 1 Phil. Ev., 418, 422; 32 Ga. R., 428. As to diligence in the matter of newly discovered evidence: 15 Ga. R., 103; 37th, 676; 38th, 174; 34th, 492; Code, sec. 3665. As to accumulative evidence: 9 Ga. R., 7; 26th, 589; 37th, 464; 38th, 319; 17th, 419; 37th, 676; 26th, 528; 34th, 492; 4 Wend, 579; 5 Cowen, 106-122; 6 Pick, 113-416; 32 Ga. R., 296-7; 31st, 34; Hilliard on N. T., 376, 384, 390; 40th, 657. If paid for by individual funds and then reimbursed by trust funds, the property is not subject to trust: 27 Ga. R., 589. As to opening the whole cause: 2 Mad. Ch., 371.

J. S. Hook. W. Hope Hull, for defendants in error.

McCAY, J.

The Act of 1847, in relation to the record of marriage settlements, so far as it relates to settlements then existing, is a very harsh law. At the date of its passage, the beneficiaries of a settlement then existing, had a perfect right to the property it conveyed. The effect of the statute was to require a record of the instrument, on pain of forfeiture, as against certain dealers with the husband.

It is but fair, that a law of this character should be strictly construed, and not extended beyond its terms. And such has been the course pursued by this Court, in its previous adjudi-

cations, upon this subject: Boston & Gunby v. Cummings, 25th Georgia, 277; Cloud & Shackleford v. Dupree, 28th Georgia, 170.

Indeed, the last case referred to, goes upon the broad principle that the words of the Act, the creditor attacking an unrecorded settlement, must show that he gave credit on the faith of the property; that is, that he trusted the husband, under the belief that the property was his.

And such, we think, is the meaning of the words of the Act. The beneficiaries in the settlement are themselves purchasers; *often the whole instrument is simply a means by which the wife retains or gives direction to her own property; and there is no equity at all in favor of the creditor. If, by the neglect to record, a person is misled—as if he finds the husband in possession, and purchases or gives credit, believing the property to be his, giving credit, based on that belief—an equity does arise in his favor. And the statute, in such cases enforces it, by declaring the settlement inoperative as against one thus misled, by the neglect to record the settlement.

There is nothing in this record bringing the case within this rule. There is no pretense that the credit was here given under any misconception. Indeed, the proof is rather the other way, to-wit: that the trustee was a man of large means in his own right, independently of the property mentioned in the settlement.

The statute requires, that the creditor shall have given credit, bona fide, on the faith of the property. There must be some affirmative reliance upon the fact that apparently the husband was the owner. The creditor must appear as an injured party, by the neglect of the beneficiaries to notify him, either in fact or by record, that the settlement exists.

2d. We do not see why the sayings of the deceased trustee are not exactly within section 3699 of the old Code. The declarations were clearly against his interest—they charged the property with the trust—they clearly were not made with a view to any (then) pending litigation, and the maker of them is dead. The weight to be given to them is another matter. That was for the jury to determine, under all the fact and circumstances of the case.

3d. It is true, that as a general rule, in a marriage settlement, the wife—the first taker, the tenant for life—may in a certain sense be said stand in the place of any other life-tenant, and be the depository, as it were, of the interest of the remaindermen, their title passing out of the grantor, with her. But the very object of the trustee is to hold not only the separate estate of the wife, but to preserve the remainder. He is trustee as well for the remaindermen as *the wife. Indeed, if the remainders be contingent. by the old rules, a trustee to preserve them was necessary. Whether necessary or not. nothing. it seems to us, is clearer than that he is trustee. He holds the title. It is not his. He holds it for the benefit of the real owners, who are, after the wife's death, the remaindermen. He is, therefore, a trustee, and is chargeable as such.

Cunningham v. Schley

4th. When, by consent, the Judge acts as both Judge and jury, it has been the uniform rule, to give to his finding on the facts all the presumptions usually given to the finding of a jury. Indeed, as he is a kind of arbitrator, selected by the parties, it might be contended that his finding stood upon even higher ground. But that it stands upon as favorable ground is undoubted. Under this rule, we do not think this finding is so contrary to the evidence as to require a new trial.

5th. When the country has furnished to disputants a tribunal for the trial of the issues between them, it is a public right that they shall not trifle with the privilege. They shall not take up the public time with two trials, when, by proper diligence, they might have secured their rights by one.

That the vendor of property should be able to tell how it was paid for, is so natural a presumption that it strikes the common mind at the first thought. There is no good reason given why inquiries were not made of this vendor before the trial. He was at hand. It was plain, that the inquiry was important, and would most surely be material on the trial. We think there was want of proper diligence, and on grounds of public policy, which favors the ending of litigation, we do not feel like coming to the aid of one who has had his day and neglected to take the proper and obvious means to secure his rights.

Judgment affirmed.

438              *APPENDIX.

The following concurring opinion in Willoughby Jourdan *v.* Lewis B. Miller, ante page 51, was overlooked:

McCAY, J., concurred as follows:

I concur in the judgment of the Court in this case, as I understand it, and as the majority of the Court has informed me they mean it.

There is no evidence in the record that Iverson Miller had received $1,200 00, as an advancement, and it was improper to charge the minor with that sum, as such.

Under the will, the legatee, Iverson, was entitled to choose the four lots, as a part of his share, at a fair valuation, and the guardian having done so, with the consent of the executor, at the valuation fixed by the appraisers, I think that was the price at which the lots were to be charged to him. The executor is concluded by this consent, unless he charges and proves that he consented under a mistake, and through fraud or accident. But if these lands, at this valuation, are more than the distributive share of this minor, the heirs-at-law, or the executor, under proper charges in the bill, and proof to sustain them, can compel the guardian to pay the overplus.

Taking the will altogether, it was the testator's intent to divide his property equally between the legatees, charging each one with his advancements. And the right of choice, in the several items of the will, was only a right to take certain specific property, at its value, as a part of the equal share, to which each was entitled.

See Jourdan *v.* Miller, ante, p. 51, and foot-note.